Will Mr. Patti, is Mr. Patti here? Yes, sir. Please come forward. Next case is In Re White, 2018-12-42. You have a co-counsel. He's welcome to come up. He's the applicant, actually. I'm sorry? The applicant. All right. Well, he belongs in the audience rather than at the council table. Yes. Mr. Patti, please proceed. Good morning, Your Honor. Good morning, Your Honor. This case before you is a great example of the maxims and trademarks that marks should be viewed in their entirety. The similar case to that maxim is In Re National Data Court. Mr. Patti, on page 18 of the blue brief, you ask us to take judicial notice of the teaching of American history in public schools pursuant to FRE 201. On what legal basis can we take judicial notice of the teaching of American history? Is there a particular book or academic reference or something to which you're referring us? Yes, Your Honor. During the prosecution of this matter, we did submit copies of several sources. Most of them were online. I think in terms of the format, which was the basis of denying the entry of that evidence into the record. But in particular— Are they in the record or no? They're not. Well, we submitted them in our response, but they're not part of the evidence for this case. Mr. Patti, the goods here are shirts. They're identical. The maps give the same commercial impression. They overlay the map of the United States and the map of Africa, and both of them do. And so what was the TTAB's error? We believe they erred in a few ways, one in terms of their conclusion with regards to likelihood of confusion. Your Honor, Judge Lurie, we do concede, we always have, that the goods and services in this particular case, T-shirts versus clothing, namely hats and shirts, that they are legally related per the DuPont test. We concede that point. We disagree with the PTO with regards to the first DuPont factor in terms of similarity of the marks themselves. What's interesting about this case is that, generally speaking, when an examiner will— Yes, sir. One of the points you make about that is that the African-American population in the United States would know that distinction. But your claim wasn't limited to the African-American population. Yes, Your Honor, we do recognize that. And part of our argument in our petition to the court is that, you know, the standard with regards to the general public, in terms of what the general public would perceive, we believe that due to the shifting demographics in the country and how the country has progressed with regards to its being more inclusive, that that standard should be maybe reviewed by the court. We do believe that, in particular, African-Americans in general, they have a long tenure within the country. And so, you know, over 30 million Americans, if it is true that there are certain perspectives that African-Americans may have and their context may be different based upon their experiences, that their perceptions with regards to mark would also be different as well. But you can limit the claim, right? Well, Your Honor, we actually thought about that. Judge, Your Honor, we've thought about that. Claims are limited, I'm sorry, IDs are amended all the time. They're amended with regards to gender sometimes, with regards to level of sophistication other times. But in terms of limiting the ID, which is what the PTO has suggested that we do, with regards to African-Americans, we think that is impractical and we think it's because you can't necessarily control who's going to purchase the goods. And so you can't control that. I don't know if an amendment to exclude it by race is something that the PTO should encourage. Judge Lurie, going back to a comment you made with regards to the similarity of the marks themselves, what's unique about this case is that the examiners, they generally, when they examine marks, they will identify what they consider the dominant portions of each mark. The examiner in this case refused to state on the record what he believed were the dominant portions of the mark. These marks are very simplistic in the sense that they only have two components, the map of Africa and the map of the United States. We believe it is our contention that- One's in black and white, which means everything. And yours is in color, but it could be the same colors. It could be the same colors, although another point of contention, it is what we understand the PTO's construction of TMEP Rule 807.14 is that basically a special form mark that's in black and white can basically use color without any limitation whatsoever. The PTO has emphasized that without any limitation. We disagree at that point. However, we do believe that color can be used, but using color to create new matter within a mark itself will run afoul of the registration system. Part of the registration system, trademark registration system, is to give notice to the public in terms of what the mark is. If you go to the USPTO site or their basic facts, it states that explicitly. If, in fact, you can construe TMEP 807.14 such that you can create a new subject matter of the mark, then essentially we don't have a registration system at all because it would never put anyone on notice. In our example, we use color. The Africans use color to embed the map of the United States within the continent of Africa. The site of registration mark does not have that at all. Based upon the PTO's construction, they could have the map of Canada, Mexico. It could go on. One other point with regards to what we believe is different in this case. Judge Laurie, you mentioned that there are kind of reverse combinations, or the legal term that we typically use in trademarks is what we consider a transposition. A transposition is a buzzword. Again, this is a term that the examiner really refuses to use because when we hear the term transpositions, the law is very clear and very best that, you know, simply because two marks are reverse combinations of each other or transpositions does not mean necessarily that likelihood of confusion, you know, exists. In this case in particular, the site of registration mark, you have the map of Africa in a somewhat dominant fashion over the United States. That's why we believe in the site of mark, the dominant portion of the mark is Africa. The question is to consumers, why is the map of Africa over the United States? And it appeared to be in an aggressive manner. In our mark, we see the United States, what we consider within the bosom of the continent of Africa, which raises the question, what is the United States doing there? Again, the PTO, they view these marks outside of any historical context. It is our belief that the PTO views these marks within a vacuum. They refuse to look at the historical context of the marks themselves. If you were to see our mark, which has the colors red, black and green, it's very obvious, at least to many, what those colors represent and why the United States, what that represents as well in terms of the African diaspora, the displacement of African people outside of the country, particularly to North and South America. In addition to this whole notion of repatriation, which was a pretty big movement early in the 20th century. You recognize, I'm sure, that what you're asking for, we actually can't give you this relief as a panel. Not only has this court already held many times that the entire consuming public is the source for assessing the meaning behind a mark, the consumer public, which is not limited to African Americans or white people or anything else, but every court in the country, every regional circuit in the country has similarly adopted that same standard, the entire consuming public, when you haven't limited the class of customers for your goods. So what you're asking this panel to do is to look at it from the perspective of a particular racial group, which would put us at odds with our own circuit precedent, as well as the circuit precedent of every circuit in the country. So I hope that you recognize that even if there was merit to what you're saying, this panel can't possibly give you that relief. Your only possible relief would be an in-bank action. And then it'd be an uphill battle because you'd be telling us to adopt a standard that is different than the standard every regional circuit in the country employs to similar cases. Judge Moore, that's an excellent point. The point with regards to that standard, we don't rest our positions solely on that. We believe even outside of that, looking at the marks themselves, you know, we believe it's clear to consumers that there's no likelihood of confusion. In addition to that, we thought this could be an opportunity to maybe review the standard. But looking at the marks, again, I spoke with the examiner. We had an interview. And based upon what's on the record in terms of the office actions that were submitted, the examiner was fairly dismissive, so to speak. The analysis was very, very brief. It was one has the map of Africa in the United States and no one has the map of Africa in the United States. And pretty much there's likelihood of confusion. Again, looking at the maps, we think, I'm sorry, looking at the marks themselves, we believe that consumers would notice the distinction. Your rebuttal time, you may continue to use it or you can save it. I'll save it for rebuttal. Ms. Haber. Good morning, Your Honor. May it please the Court. I do want to clarify to begin that there's nothing in the TMEP or the way that the office considers design marks that would allow us to construe a mark like the registered mark or any design mark that doesn't claim color to use color in a way that creates a new design element that isn't present in the mark. That would be a different mark. But there is no restriction, and we can imagine many schemes of color being used in this black and white drawing here in the registered mark that would include red, black, and green, the same colors that are in the applicant's mark. Well, in fact, I mean, this isn't even a question that we can answer, right? Because didn't our data packaging case from the CCPA already answer this question? So even if we were to disagree with that idea, we'd have to take it in bank. This panel wouldn't be able to overrule the data packaging case, correct? That's correct, Judge Moore. Yes. And here, what the basis of the similarity finding, we have to also remember that this is always from the perspective of— I'll tell you, I don't think they're similar. I look at them, no chance I would think that these two things came from the same source. No chance. So what do I do about that? Is that because you're looking at the registered mark only in a black and white form? Could you imagine— Yeah, do you want to give it to me in a color form? Do you have a color version? I didn't bring one with me, but if we visualize the west coast of the United States, for example, in red, the Africa portion in black, the east coast in green, and— Still not even close. One of the marks is Africa within the U.S. The other is the U.S. within Africa. If we're going to change the white portions to red and green and not the black portion in the actually already registered design mark, then you're changing the left and the right, not the up and the down. So, I mean, there are all kinds of flags out there that use the same three colors, right? Some of them use them vertically, some of them use them horizontally. I don't get them confused. Right, James? Your Honor, here, it's about the average recollection, not a side-by-side comparison. We're not dissecting. So, if you see on a shirt a map of Africa and the United States, they're center aligned, they're vertically oriented. I see this map, and gosh, it's in the colors of the Pan-African flag, assuming that people understand that those are the colors that it represents, right? I mean, there's no evidence in this record of the historical context or that those are the colors. But even if we accept that to be so, the same general impression is conveyed when you see those colors, red, black, and green, with Africa and the United States. To me, the mark-seeking registration, by virtue of having the U.S. contained within Africa, it actually tells me, even if I don't know what the message is that that mark is trying to convey, it's trying to convey a message about Africa and the United States. The one on the right doesn't necessarily have, by any stretch, convey that same message, especially when the one on the left breaks up the top and the bottom and the colors and stuff. But the one on the right, I don't know. It doesn't, to me, I don't have any clue what the one on the right is supposed to convey, and it doesn't jump out to me as indicating that it's attempting to convey any kind of political message, whereas the one on the left actually does. I look at the one on the left, and I think, there's a political message in there. Even if I don't know what it is, that they're attempting to convey something about their political views, whereas the one on the right is just two countries superimposed on top of each other. You know, I don't know. They don't look similar to me. So, I don't know. We have to assume the same colors, and in the registered mark, there's nothing that prevents even the map of Africa portion being presented in multiple colors. In the registered mark, the black part can be presented in different colors, or only the white part? It can be presented in different colors. It's not limited to any array. Really, the only limitation is, if you create some new design element from color, that's not encompassed here. But you could have, you know, gradient colors in any of the portions, and we have to construe, you know, under the... It can't look identical, because that has a distinct design element of the United States inside of it. But you don't even need to go there. I think the scope is broad enough to, and certainly under this court's precedent, the arrangement of colors that we have to consider. On the registered mark, would dividing the United States into red, white, and blue be a new design element? Using vertical lines, that is, now you have three blocks. Or would it just be colors? It could be. I mean, I think if you color the segments that exist there, those three regions in color, that's not a new design element. But if you put, you know, a distinct pattern in there, maybe now you're having a new design element that isn't actually part of this mark. Now, the registered mark owner can use it in any way they want, but would the scope of the registration cover that design element? No. And I think if they came in to amend, you know, the registered mark owner came in to amend their registration to put a design exactly like the registered mark owner, the PTO would say no, because there's a map of the United States in it now that wasn't there in your original mark. But the ways that this registered mark can be displayed, if it's in the same colors of the Pan-African flag, to the average consumer who sees these marks at a distance and, you know, spatially in time, they're going to have the same idea of, oh, it's Africa and the United States in this Pan-African flag. That's the kind of similarity and similar commercial impression that we're concerned about here, particularly where we have identical goods and the consumers and channels and trade are the same, and these are low-cost items. This is, you know, a classic case of where confusion is likely, and if there's any doubt on the issue of likelihood of confusion, it does not get resolved in favor of an applicant. It gets resolved in favor of the registrant. So here, Mr. White has shown no error in the board's analysis. It's legally correct, and we ask this court to affirm. If you have no further questions. Thank you, Ms. Haber. Mr. Platty has some rebuttal time, close to four minutes if you need it. Thank you, Your Honor. Well, I just want to say from the outset, we agree with the PTO. It's good to hear that their understanding of the rule, TMEP 807.14E1, is not, it has some limitations. This is the first that we've heard in terms of what the commercial impressions of the marks are. I think in terms of placement, placement is very, very important. In the sighted registrant mark, you have the continent of Africa over the United States. I think, again, the United States is a sovereign nation. Having any country or continent overshadowing it is. Yeah, the one on the left tells me Africa is the dominant conveyance, and the U.S. is within Africa. The one on the right is the U.S. is the dominant, and Africa has been consumed by the U.S. Exactly. I don't know, but the problem for you is I don't get to make this decision. I mean, I find in your favor, I'll tell you right now. But the problem is substantial evidence is my standard of review for the similarity of the marks, and I'm struggling. I mean, the examiner did this divorced from sort of the pictures, although all the elements he explained makes it sound pretty persuasive. Both marks involve superimposing one country on the other. The registered mark doesn't use color, so the color can't really be the visually distinctive factor because the registered mark uses the same color. So in the abstract, I read his opinion, or her opinion. I don't know if he's a guy or a girl. But it's harder for me. If I got to decide this de novo, I'd find it in your favor, but I don't get to. I have to say, is there no evidence that supports what the examiner decided? And that's harder for me because, you know, I certainly don't want to go beyond what my authority is. And I think to find in your favor would cause me to go beyond what my authority is because I'm supposed to give a lot of deference and weight to what the examiner said. Your Honor, we definitely respect that sentiment. What we will say is that if you take a look at what the examiner stated on the record, it's almost like it's almost a cookie cutter. I know, it's very cursory. I saw, I read it, it was very cursory. And it could be applied to any. What often is? Well, Your Honor, and respectively, I've prosecuted many trademark applications. And generally speaking, when it comes to a 2D analysis, it's pretty lengthy and pretty involved. And I can tell you in terms of. Not the ones we get. Oh, not the ones you got. Okay, got it. But this one in particular from the examiner, it was so brief that it appeared that the examiner just pretty much was very dismissive of it. He said, okay, both marks have the map of Africa and the map of the United States. Like a little confusion. And so without really taking the time to do what I think what a normal consumer would do to kind of see exactly what I mean, these are pure design marks. So there has to be some message that's being conveyed. There's no literal elements. And so, again, we think the examiner, I'm sorry, the PTO erred in terms of their conclusion, in terms of like a little confusion. And notably, the grandpa case. I have to say. Yes. I agree with Judge Moore in the sense that if I was trying this, if this was a trial and I was trying it at the trial level, I'd make you put in one of Professor Gates' books and have, or a couple of them, and have some background that could add weight to your argument. But it's not there. Anything further, counsel? I think that is it. Thank you. Thank you very much. We'll take the case under review. All right.